We have two cases on for argument this morning, but before we begin, I would like to welcome on behalf of the Court a visiting judge that we're delighted to have with us today, the Honorable Marilyn Hall Patel of the Northern District of California, an extremely experienced distinguished federal district judge, formerly chief judge of the Northern District of California, and one of the judges who has kindly consented to spend some time helping us out as part of a program of having visiting district judges. We're delighted to have you, Judge Patel. Thank you, and I'm delighted to be here. Thank you very much. The first case for argument today is number 2008-3139, Doe v. Justice. Mr. Swick, when you're ready. Thank you, Your Honor, for the police of court. Mr. Doe was fired because first the FBI and then the MSPB had an emotional reaction to the unsavory conduct that they thought he was involved in. Not because there was any sort of principled analysis of what he did, taking the facts, applying to the existing rules, and coming to a principled conclusion. Now, Mr. Doe has admitted that his conduct in these relationships was at times morally wrong. But absent criminal conduct, morally wrong does not give the FBI a right to intervene into this and to take action against him. Well, that's sort of difficult for us to determine what conduct goes far enough to be the ground for discipline and what doesn't. My understanding of one of your arguments, anyway, is that you're saying that he was disciplined because the deciding official thought Weiss, I guess was his name, or Weiss thought that this was criminal conduct and that he was mistaken about that. Well, that's correct. But not just Mr. Weiss, also the proposing official, Ms. Rourke, and his supervisor at the field office, A. Sack Cline, all three of them were in the mistaken view that he had violated the criminal law. Was the question addressed, we have a case called La Chance against Duval, which says that if you have several charges, which are only one of which are fewer than all of which are sustained, you may have to have a remand to reconsider the penalty. Was there any testimony here by the deciding officials as to what they would have done if they had known that this was not criminal conduct? No, the administrative judge addresses that in his second decision. When they have, let's see, the administrative judge the first time just finds there's no nexus and he reinstates it. And then the board reverses that and sends it back for a hearing, we find there is a nexus, but you need to assess the penalty here. And then in the course of that assessment, the administrative judge notes and finds that you can't make that determination because all three of the officials, when they testify, and there's a little summary of their testimony by the administrative judge in his opinion at page 45 of the joint appendix, but all three of them, whether they say they lost confidence or they say it was misconduct themselves, but all three, Mr. Rourke, Mr. Weiss, and Mr. Klein, say that it's tied to their belief that he violated the criminal law. I think the reason the testimony came like that is these FBI officials are aware of what their policy says. And they're aware that to take an action, they've got to keep it within their policy and their policy cuts them out of the action if there's no criminal... But their policy does not require that there be criminal conduct. Well, no, it doesn't. Characterized misconduct, not all misconduct, of course, is criminal conduct. Well, it has exceptions. But the exceptions are abusive positions, sexual harassment, stuff like that, nepotism, or favoritism. And none of that's involved here. Mr. Doe didn't even work at the same office of the women who were involved. He was assigned to the same headquarters office, but his duty station, really at the time all this was going on, was nearly 100 miles away. He wasn't even aware of the, I guess, the rumor mill that had been stoked when his fiancée, before she was his fiancée, but she went into his home and went through his materials and found this. He wasn't aware of that. But there's no indication of this. The problem is that the policy is not clear. Oh, I don't think so. Well, you may not think so, but I think the policy is not clear as applied to these circumstances. But at the same time, if the deciding officials interpreted the policy in these circumstances as requiring criminal conduct, and it may be that there needs to be a remand to consider whether they would have opposed the same discipline or reached the same conclusion that they did if they'd known it wasn't criminal. And you're telling me that that issue wasn't addressed, really, at the hearing. Well, what would you have done if you had found that it wasn't criminal, it was never addressed at the hearing? What was addressed at the hearing was their firm belief that it was criminal, and that's what they're basing the action on. Are we talking about the hearing before the board or the removal hearing? The hearing before the board is the hearing we're talking about. There was a meeting that Mr. Weiss had before he made the decision to terminate, but the actual hearing where the testimony was taken was before the Marist Protection Board judge. The thing with the policy, to me it's really the only way that it can be that will make any sense. Maybe back in the days of J. Edgar Hoover, no FBI employees have sex unless it's with somebody they're married to legally, and anything other than that we're going to fire you for it. They may have tried to do something like that, but that was never tested, and that's certainly not what they're doing here. Was there any testimony by the FBI officials as to how they interpreted the policy in circumstances like this? Assuming that there was no criminal conduct. I believe that their testimony is fairly clear that they did interpret the policy. It is their policy. They did interpret the policy to what? To require criminal behavior, and that's why across the board they said there was criminal behavior. If you don't have that, you just have all kinds of unworkable things that come up. If there's adultery, extramarital affairs, they say right in here they're not interested in that, but you have to do that or it's going to be completely unwieldy. If one partner tells the other she's on the pill and she's not on the pill, is the FBI going to get involved? If one partner tells the other I will marry you and he doesn't, is the FBI going to get involved in that? It's dishonorable. They could be morally wrong. Do you understand the board's decision, and it was the removal decision that you're obviously taking issue with here, that that decision was premised on criminal conduct? No, the board's decision never was. It was premised on misconduct, dishonesty, right? Interference with the efficiency of the agency. You see the words clearly, dishonest, quoted. Where that comes from the very first time is the first board decision, page 42 of the joint appendix. The board says that. The FBI doesn't say that. The FBI gloms on to it after the board does say it the first time. To me, dishonest means you say something isn't true. That doesn't mean that this is good, morally wrong to do what he did, but clearly dishonest, I guess if you want to call it that you can call it that, but that's not what the FBI was calling it the first time. But it's surely no more dishonest than a husband cheating on his wife, and they have disavowed any interest in that sort of stuff. So if they're going to take, like, you're clearly dishonest in this relationship, therefore we don't trust you and we're going to fire you. I mean, that's really no constraint on them at all. What's more, they didn't do that. They didn't believe that themselves, and it's very clear from the record. If you look at the Douglas- I'm sorry, they didn't believe what? That he couldn't be trusted and they couldn't rely on him. And if you look at the Douglas-Factors write-up that was done, it's in the Joint Appointments at page 120, that's done by Mr. Klein. He's the assistant special agent in charge in the field office. And in here, he's saying he's upset that this Ohio statute was violated, and people have some questions about whether they can trust this guy, and he recommends a 30-day suspension. That's done on January 20, 2004. If he violated Ohio criminal law, there's no question that they could have discharged him, right? No, there's no question about that. You're right. I agree. He's a law enforcement officer. The law enforcement officer violates the law, then they can take action. Now, they don't always do that. I mean, they have agents that get arrested for prostitution. They don't fire them. And if you look in the precedent that we gave you, there's criminal things happening there that they don't get fired for. But I think the board would say that you leave that to their discretion if there is criminal conduct. But here's the key thing. January 20, 2004, he does his Douglas-Factors write-up. And in the Douglas-Factors write-up, he's talking about the case he recommends 30-day suspension. Then, if you go to the Joint Appendix at page 149, it's now March 2004, two months later, a little bit more, and Mr. Doe is getting his evaluation. And in the evaluation, he gives him the highest evaluation he can. He rates things like professional standards. Maintaining high professional standards meets expectations. Judgment meets expectations. This is two months after the Douglas-Factors write-up. And then, after the administrative judge reverses the decision and gives interim relief, which means they have to start paying him again, what to do with him? Now, there's lots of agencies that face with that. Just pay the person to say, look, we don't want to see you. The board reinstated you. And they put him into the headquarters operation, as I recall, correctly? They did. They put him in the counterterrorism division. The reason I cut to the chase there is you're into your rebuttal time, and I wanted to see if you wanted to save it. Well, I do want to save it. Let me then disclose that we're saying that when they put him into the counterterrorism division, he works there, he gets a really favorable rating, and he gets commended for the work he does. In fact, he even gets put into an acting supervisor role. They wouldn't do all that if they really lost confidence in him. They could just say, don't come, and we'll call you if we lose the petition for review. Well, at some level, the Bureau has continued to want to get rid of him because otherwise they wouldn't have taken an appeal from the second AJ order. I mean, they could have let it drop there. There's no question that they have. So to say that, well, he's back in their good graces is not entirely consistent. Well, I think there's a need to distinguish between how they're handling the litigation and what they do with him as an asset. Very good. Thank you. Thank you, Mr. Stewart. Mr. McNamara. May it please the court, if I could just begin by addressing this issue of whether the agency's decision was predicated upon the idea that Mr. Doe committed criminal conduct. Before you get to that, let me ask you a hypothetical. Suppose that the FBI had said we are discharging him solely because he engaged in criminal conduct. Can the board then come in and say, well, that's wrong. There was no criminal conduct here, but we think he violated other FBI policies. Therefore, we're going to sustain the removal. Can the board do that? That might implicate la chance. I'm not sure whether the board can ignore the basis that the agency itself puts forward and substitute another reason. That may be impermissible. But here, the agency was very careful in the deciding official's decision on page 75 of the joint appendix. It's very clear that he is being removed following an allegation that he engaged in unprofessional conduct, not that he engaged in a crime. On page 77, the deciding official notes, in fact, your nonconsensual recording may have constituted a violation of criminal law. But that's not the same thing as saying you violated this particular Ohio statute. This is a crime. We have to remove you. I think it's very clear from the deciding official's decision here, from the testimony of Mr. Doe's supervisor, that he was removed because of the underlying conduct, not because of the criminal consequences or criminal implications of what he did. The agency found what he did here, which was the repeated nonconsensual invasion of the privacy of three women, to be dishonest conduct. Two of those women were employed by the FBI. Was it that conduct in and of itself, or was it that conduct and then what was perceived as the subsequent disruptive effects upon the office? Well, there are three sort of separate avenues that can support a nexus with the efficiency of the service. Disruption is one of them, and we make that argument in the brief. But disruption is not, and the agency's operations certainly were disrupted. The supervisor testified that he had to spend a great deal of time counseling these women, and the women's job performance itself was affected. But even aside from that, if an agency reasonably loses trust and confidence in an employee, that's enough to support a nexus with the efficiency of the service. Is there substantial evidence in the record in this case that, in fact, the agency had lost confidence? Yes, absolutely, Your Honor. The supervisor, Mr. Klein, his immediate supervisor on pages 106 to 109 of the joint appendix, testifies very clearly that he lost confidence in Mr. Doe's ability to do his job. And he's the one that proposed the 30-day suspension. He is. So he lost 30 days' worth of confidence. Well, he did propose that without the whole file in front of him. OPR was the- What was missing from the file when he looked at it that's pertinent? I believe he had the sworn statements of the people involved. I'm not sure- Do you know for a fact that there was any pertinent material fact that he was unaware of? Issued his position. Let me see what- Well, he doesn't say- I mean, he says himself on page 111 that he was not intimately involved with the investigation. I'm not aware of any particular facts that he was not aware of. I don't think he- Well, go ahead. I don't think that he had access to or had seen, if I'm remembering correctly, the precedent database. But regardless of his view, OPR, which is- I mean, he was the supervisor on the ground. OPR, the part of the FBI that is charged with investigating this sort of conduct, found that what he did was clearly dishonest and that that supported a nexus with- Yeah, but when we're talking about loss of confidence, it would seem to me you would look at the supervisor whose testimony about loss of confidence you're relying on rather than somebody in OPR. I don't think that's the case, Ron. I think we can look at the supervisor's testimony, and that testimony is clear. And you're correct. He did initially recommend a 30-day suspension and a transfer. But I don't think there's anything wrong with looking at OPR and the proposing and deciding officials' decisions, both of which also clearly indicate that the Bureau had lost trust and confidence. But perhaps they lost the confidence because they thought it was a criminal violation. I mean, on 77 in the decision, there seems to be a pretty clear reference to an apparent violation of state law. And I guess the problem is we don't have any explicit testimony that they would have removed him as a penalty if they had understood that this wasn't a state law violation. Am I correct about that, that there isn't any such testimony? I don't think that there is any expressed testimony by the deciding official saying that he would have been removed if this was not a violation of state law. But the testimony about the fact that it – I mean, the violation of the law, it just was not central to the decision. The testimony of the supervisors reflects that. It's really the underlying conduct. It's not like they were sort of trying to get him on a technicality, like what he did somehow violated the law and we can't have FBI agents around to violate the law. The agency here recognized that his repeated conduct was dishonest. Is it really the dishonesty that's the problem? If so, why is this worse than suppose he had been dating both female number one and female number two and telling each of them that he was going to marry them? You wouldn't have fired him for that, I assume. Well, the line – Let me first get the answer to the predicate of my question. You wouldn't have fired him, correct? I don't know. I mean, that – it's a decision that – It sounds like it falls pretty squarely within the policy, right? I don't – it depends. I mean, I don't – I'm not trying to be evasive, but it certainly depends. You're succeeding. It depends. I mean, these are fact-intensive cases. They're fact-intensive questions that are within the discretion of the agency officials. If the agent – the standard really is – That really seems to me, if that's the government's position, it doesn't seem to me the policy stands for much other than to indicate to an agent that the policy will apply unless we think it shouldn't in a particular case. No, no. The policy says OPR does not investigate allegations based upon the morality of romantic or intimate relationships or upon the marital status or gender of the parties. So adultery. Well – Some case of adultery. Yes. I mean, in a – Even the adultery in which one has – this is not consensual adultery, in which one has informed one's spouse that that's what's going on. But adultery involving the dishonesty that accompanies having an affair unbeknownst to your spouse. Would that be within the scope of the policy? That may be within the scope of the policy, but again, the scenarios – Depending on what? That's going to be presumably a kind of fact situation that pretty much will describe something that happens – If they are – Fairly often in human experience. Sure. I mean, if both employees, for example, are employed by the FBI, if there are circumstances that somehow would lead a reasonable supervisor to lose trust and confidence in an employee, then this policy may not apply. What about the situation that's – What does that mean, lose confidence in – I mean, is just saying it so for the supervisor to get on the stand and testify and say it so, is that enough? I mean, don't you have to have some facts that would essentially compel the conclusion that – in other words, evidence that would compel the conclusion that there was a reason for losing confidence? Because otherwise, any supervisor who doesn't like an employee can just testify and lose confidence in them. Well, Your Honor, yes. It is not unfettered discretion. I don't mean to suggest that. Sounds pretty close to it. If a supervisor gets on the stand and testifies that he lost confidence, if that loss of confidence is unreasonable, and I think that's – I mean, this Court in Brooke has made it clear that it's the unreasonable – it's the reasonable loss of trust and confidence. If that supervisor's loss of confidence is unreasonable, then it would be insufficient. What about the situation we have here to follow up on Judge Bryson's hypothetical? We have a situation in which apparently Doe was telling female number one that he wasn't dating female number two, and it turns out he was lying about that. Is that kind of dishonesty ground for removing? It might be. I mean, Your Honor, again, I know you're – I'm not trying to be evasive, but that may be a situation where it's just not reasonable, where in personal relationships sometimes lying happens, and in that sort of – in that scenario, or perhaps in the scenario of sort of run-of-the-mill adultery, that may not be reasonable. But in this case, we have this repeated – I mean, it's really – this is a very fact-specific case. We have repeated nonconsensual invasion of these women's privacy, two of whom work for the FBI. In this case, it was entirely reasonable for Mr. Doe's supervisors and the Bureau as a whole to lose confidence in him. The reasonableness is not before this Court. This Court is only determining whether substantial evidence supports the Board's conclusion – not to split hairs, but supports the Board's conclusion that what Mr. Doe's supervisors found here was reasonable. And there is ample – an ample amount of evidence, and certainly a substantial amount of evidence in the record to support that conclusion. So is it the – what makes this quote dishonest, the surreptitious nature of the conduct in and of itself? Yes, Your Honor. So if this fellow – if this agent had done this kind of videotaping surreptitiously and not told anyone, including female number one, and they never found out about it, other than he happened to mention it to a buddy – so-called buddy, I guess – and the buddy calls up the FBI as informant and says, you know, I've got information, et cetera, and tells them that he is doing this, is – would that be sufficient basis for supporting a finding of lack of confidence under your theory? Yes, it would be. Even if it never hit the office, the people in the office never knew about it, the women never knew about it or anything else, just that information? Yes, it would be. You don't need to have disruption of the office's functions. We have that here, but it's not necessary. If an agent – we have to remember, this is a law enforcement agency. The FBI is entitled to hold its special agents to a high standard of conduct. We're talking – we've been talking about the personal relationships policy. But what is that standard, and is this agent on notice of what that standard is? That standard is very clear. It's on pages 77 and 78 of the Joint Appendix. It applies expressly to off-duty conduct. But, for example, agents are instructed that they need to have integrity and be honest, and this, quote, includes behavior that shows the person to be honest, trustworthy, self-disciplined, and respectful of laws and regulations, behaviors that display high standards of ethical conduct and actions, et cetera. And then two paragraphs later, this standard is expressly applied to off-duty conduct. But you agree that not all dishonesty would be ground for removal. I thought you agreed with the situation where somebody lies about dating another person. You seem to agree that that wouldn't be ground for removal. The point is that there are difficult lines to draw here, and don't we need to be sure that the FBI decision-makers are drawing the line that you advocate, that this conduct here is on the side of removable conduct as opposed to on the other side? And given the fact that they kept saying that they were heavily influenced by the criminal conduct, don't we need to know whether if the criminal conduct were taken out of the equation, the decision-makers would have reached the same decision and why they would have reached the same decision? No, Your Honor. I don't think we need to know. I don't think the criminal question would have made a difference. It was a very close question, for one. This was a question of statutory interpretation. The A.J. engaged in this strict construction of the Ohio law. But, again, this was behavior that was criminal in other states, and regardless of whether it was criminal or not, it simply evidenced a pattern of dishonest, deceptive invasion of privacy. Here's a Friday night card game, a poker game, and he has a mirror set up to make it closer to his video camera, which enables him to see the hands of his fellow players. You see he's cheating. Is that enough to get him fired? It goes on for six months. Right. It may be. It depends. It depends. It may be. What does it depend on? Does it depend on whether the FBI is feeling like getting rid of the guy this week, as opposed to not? That's what's bothering me is that this it depends, in response to every one of these questions, leaves me wondering what it depends on. Because those facts could very well come up three different times and would have three different responses by the Bureau, and if you had the same response, which would it be? Well, the answer is, again, it is heavily dependent on the facts. Well, I've given you the facts. There aren't any more facts. It's a good agent. He's not, I don't know, supervising the gambling investigations. So there's no nexus along that line. It's a pure question of private dishonesty. In that situation, it may very well be. If it is dishonest conduct that leads his supervisors to reasonably lose confidence in him and repeated cheating at a card game may be sufficient. But doesn't this answer then lead to an arbitrariness in the decision-making? First of all, don't you have a problem with notice to the employees as to what is expected of their conduct, particularly when you keep saying it depends? It depends. And that it really leaves the person making the decision with a wide range of options, including anything from a short suspension, as we saw here, to a longer suspension, to probationary status, perhaps, or some other status, to removal. And that's quite a range with a it-depends kind of standard. Well, but that is inherent in any situation, in a lot of situations, where agency officials are making decisions that are within their discretion. Agency table of penalties typically do range from minor punishment all the way up to removal, as they did in this case. And, yes, there is a certain amount of the Bureau's discretion, but the agency's policy here about honesty and integrity is very clear. And if special agents, in particular, and, again, we're talking here about special agents. We're not necessarily talking about support employees or other folks who don't carry weapons. We're talking about people who are entrusted and expected to maintain very high standards of conduct. Those standards are very clear. If they are honest, if they have integrity, none of this will be a problem. That's the line that they should stay above. If they go below that line, then it becomes a more difficult question, and it becomes a case-by-case type of question. And that becomes a question also of how far afield in their private lives do you go in order to determine honesty or dishonesty, right? Well, and, yes, it does. But when conduct like the conduct here is brought to the knowledge of the supervisor, I mean, this was not going out and affirmatively trying to figure out whether their employees were lying in their personal relationships. The conduct came into the office. It came to the supervisor's attention, and they followed up on it. I see I'm well into my time, but for these reasons, we ask that the Court affirm the Board's decision. Thank you, Mr. McNamara. Mr. Swick, you have a couple of minutes for rebuttal. I think what we're getting to is this question of where to draw the line. And the thing is, is the FBI did draw the line in its policy. If you just read the different things here, the private lives of FBI employees and their relationships with others are subject to inquiry by OPR when they, and it goes down, violate the regulation or a law. It goes on to say that they're talking about violations which are prosecuted under the criminal law of the jurisdiction where they're committed. They couldn't be clearer about that. And then, you know, in part two. Suppose that the male employee tells the female employee that he's not married and tells her that he's interested in marrying her, and as a result of that she embarks on a relationship. There's nothing they can do about that, right? Nothing they should do about it. He's committed a morally wrong thing. And for that, you know, people should look down their noses at him, possibly. But that is just not a thing that the FBI should be getting into. So in your view, there's no kind of lying or misrepresentation involved in a personal relationship that could lead to sanctions against the employee? No, there are things. What would be an example? Well, you don't have an STD when you do. I don't know. How about I'm using the pill when you're not? I mean, I don't know if the FBI ought to get into that or not, but it's a pretty big misrepresentation. So maybe they could fire somebody for that, huh? I don't believe they should. Is there any example you can give me of a misrepresentation in the course of a personal relationship that would allow the FBI to sanction somebody? We were just talking about caddish behavior. I don't see how that's the FBI's business. And if you try to go there, you're going to fail. I mean, actually, I hadn't thought of the example that Judge Bryson mentioned of like a person dating two people at the same time and tell them both that he's going to marry them. I mean, that's pretty unethical behavior. And I think it could be more harmful than what happened here. But still, I just don't see how the FBI can. I mean, the rest of the world has these issues, and they have to deal with them. The FBI shouldn't be dealing with them. I mean, that's stuff that people have to deal with in their personal lives. It's just not something for government intrusion. Do you think that the FBI – we have this policy. But suppose the FBI, a week before these events transpired, had decided, you know what, this policy is creating all sorts of mischief. Let's just get rid of the policy and we'll substitute for the policy a policy that says, any dishonesty in personal relationships, any impropriety in personal relationships involving any dishonesty is cause for termination. Do you think that the promulgation of a policy like that is enough to create the nexus? Or is there an independent nexus requirement that cannot be bridged by a policy such as that? Well, that's – really, I spent a lot of time thinking about that. Where did you come out? There are other things that they can do, but probably that there shouldn't be allowed to have such a policy. And I base that kind of like on Lawrence's case and kind of trying to make that apply here. I would say, though, I mean, they have other things they do. I mean, for example, there are clearances. And if you had someone who was such a lothario that you have all these different things going on all the time, where we just – I mean, where it gets up to a level they really don't trust them, and then they can take security clearance away. And then he's gone. There was no move to take Mr. Doe's security clearance. Well, since security clearances are unreviewable, they can do it right now. That would be pretty much commentary, wouldn't it? So it's not like they're not left with a way to deal with stuff. By the way, just as a matter of bookkeeping, I was curious. He was with headquarters, I gather, up until – is he still on assignment to headquarters or was he terminated after the board's most recent decision? He was – it's interesting. When they reinstated him the first time, he stayed reinstated even after the board. That's what I understood. And then he worked all the way up. And I think it was right around Christmastime of last year that he was on vacation for Christmas, and then this decision came in, and so they didn't – they asked him not to come back at that point. Okay. Thank you, Mr. Seward. Thank you. Case is submitted.